FILED & ENTERED

MAR 30 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY tatum        DEPUTY CLERK

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>VICTOR LAWRENCE SLOAN and GAIL B. SLOAN,<br><br>Debtors. | Case No. 2:12-bk-28482-TD<br><br>Chapter 7<br><br>Adv. No. 2:12-ap-02561-RK |
| RICHARD K. DIAMOND, as Chapter 7 Trustee for the Bankruptcy Estate of Victor Lawrence Sloan and Gail B. Sloan,<br><br>Plaintiff,<br><br>vs.<br><br>LAVELL WILLIAM SLOAN, an individual,<br><br>Defendant. | MEMORANDUM DECISION ON TRUSTEE'S ADVERSARY COMPLAINT TO AVOID AND RECOVER VALUE OF FRAUDULENT TRANSFER AND FOR TURNOVER |

The above-captioned adversary proceeding on the complaint: (1) to avoid and recover value of fraudulent transfer; and, (2) for turnover came on for trial before the undersigned United States Bankruptcy Judge on October 1, 2015.  Plaintiff Richard K. Diamond, as Chapter 7 Trustee for the Bankruptcy Estate of Debtors Victor Lawrence Sloan and Gail B. Sloan ("Plaintiff" or "Trustee") brought this adversary proceeding seeking relief to avoid and recover the value of an alleged fraudulent transfer of the 50 percent ownership interest of Debtor Victor Lawrence Sloan ("Debtor" or "Victor") in the Property located at 3711 West 107th Street, Inglewood, California 90303 (the "Property"),

pursuant to Sections 544, 548 and 550 of the Bankruptcy Code, 11 U.S.C. ("Bankruptcy Code"), Sections 3439.04(a) and 3439.04(b)(2) of the California Code of Civil Procedure, and other applicable law, and turnover of the Property pursuant to Section 542 of the Bankruptcy Code from Defendant Lavell William Sloan ("Defendant" or "Lavell").  Kevin D. Meek, of the law firm of Danning, Gill, Diamond & Kollitz, appeared for Plaintiff, and Trustee also appeared for himself.  Randal A. Whitecotton, of the law office of the Community Law Center, appeared for Defendant.

On November 11, 2015, Plaintiff timely lodged his "[Proposed] Findings of Fact and Conclusions of Law."  ECF 113; Transcript of Trial, ECF 110 at 88.  Defendant did not lodge his [Proposed] Findings of Fact and Conclusions of Law" as ordered by the court by the deadline of December 2, 2015 or at any other time.  After this deadline passed, the court took the matter under submission.

Having considered the testimony of the witnesses, the documentary evidence received at trial, and the oral arguments of the Parties, the proposed findings of fact and conclusions of law submitted by the parties, and the record before the court, the court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil Procedure.

As recited herein, some of the findings of fact were adopted in the Unilateral Pretrial Order entered on July 24, 2015.  ECF 101.

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding was commenced pursuant to Federal Rule of Bankruptcy Procedure 7001, and based upon claims that Plaintiff alleged pursuant to 11 U.S.C. §§ 502, 544, 548 and 550 as well as applicable California law.  This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), (K) and (O).  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409(a).

///

2

**BACKGROUND**

The underlying bankruptcy case was commenced on May 25, 2012 when Debtors Victor and Gail Sloan filed a joint voluntary petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C.  2:12-bk-28482-TD, ECF 1.  Plaintiff accepted appointment as the Chapter 7 trustee for Debtors' bankruptcy estate and continues to serve in this capacity.  On Schedule F of their bankruptcy schedules, Debtors, under penalty of perjury, listed 16 creditors with unsecured nonpriority claims aggregating $385,300.00. *Id.*  Proofs of claims have been filed by Northrup Grumman and Los Alamitos Imaging Center in the amount of $9,528.26 and $500.38, respectively.

On November 29, 2012, Plaintiff filed the complaint in this adversary proceeding. 2:12-ap-02561-RK, ECF 1.  On December 28, 2012, Defendant filed and served his answer to the complaint.  ECF 8.  Plaintiff brings this action solely in his capacity as the Chapter 7 Trustee for Debtors' bankruptcy estate.  Defendant is an individual residing in the County of Los Angeles, State of California.

On or about March 30, 2010, Victor's mother, Martha Boozer ("Martha"), transferred her 50 percent ownership interest (the "Interest") in the Property to Victor, via quitclaim deed recorded in Los Angeles County as Instrument Number 20100459663 (the "Martha Quitclaim Deed").  Unilateral Pretrial Order, ECF 101, at ¶ 13.

On or about June 29, 2011, Victor transferred (the "Subject Transfer") his Interest in the Property to his brother, Lavell, via quitclaim deed recorded in Los Angeles County as Instrument Number 20110989039 (the "Victor Quitclaim Deed").  *Id.* at ¶ 14.  The Victor Quitclaim Deed expressly states that no consideration was provided for the Subject Transfer and that the Subject Transfer was a "bona fide gift and the grantor receiving nothing in return."  *Id.* at ¶ 15.

On November 29, 2012, Trustee filed his complaint against Defendant, alleging claims to avoid and recover fraudulent transfers and for turnover, commencing the adversary proceeding against Defendant.  ECF 1.  For his first claim for relief, Trustee

1  alleged that pursuant to Bankruptcy Code [11 U.S.C.] §§ 544, 547, 548 and 550, the

2  Subject Transfers or Obligations [i.e., the Subject Transfer] are avoidable, entitling

3  Trustee to avoid and recover the amount thereof of the Subject Transfers or Obligations,

4  plus interest thereon at the maximum legal rate from and after the date of the Subject

5  Transfers or Obligations, in a sum according to proof at trial, but which Trustee is

6  informed and believes exceeds $90,000. *Id.* On or about December 28, 2012,

7  Defendant served and filed an answer to the complaint. ECF 8.

8  **ANALYSIS**

9  The claims alleged by Trustee in his complaint in this adversary proceeding are to

10  avoid the Subject Transfer, the alleged fraudulent transfer of Debtor's (or Victor's) 50

11  percent ownership interest in the Property, under federal and state law, and to recover

12  the value of this interest or for turnover of the interest. In response, Defendant (or Lavell)

13  has raised in this adversary proceeding the defense that Victor did not really have an

14  ownership interest in the Property because Victor was only on title as a matter of

15  convenience to help obtain a loan on the Property owned by Lavell and Martha, their

16  mother, to obtain funds to pay for her medical care because she was in failing health.

17  This raises a threshold issue of whether Victor had an ownership interest in the Property,

18  which Trustee argues that Victor did and which is recoverable by the estate, but which

19  Lavell argues that Victor did not and that this would be a complete defense to Trustee's

20  claims. As noted by Trustee, an interest in property is determined by applicable state

21  law, here, California law because the Property is situated in California. Trustee's First

22  Supplemental Brief, ECF 111, filed on November 2, 2015, at 6-7, *citing inter alia, Butner*

23  *v. United States,* 440 U.S. 48, 55 (1979). Trustee argues that pursuant to the operation

24  of California Civil Code § 1213, *et seq.,* and the Ninth Circuit's holding in *In re Trujillo,*

25  166 F.3d 1218 (9th Cir. 1998), legal and equitable title to real property occurs upon

26  recordation of a deed. ECF 111 at 11. Thus, since "Victor was on title to the Property,

27  Victor was free to encumber or convey his interest in the Property as he wished, and

28  4

1  consistent with his mother's intent, he attempted to do so, as he admitted at trial that he

2  intended to obtain and repay a loan on the Property using his credit . . . Consequently,

3  just as was the situation with the residence in *Trujillo,* Victor's Interest is fully subject to

4  the fraudulent transfer provisions of 11 U.S.C. § 548." *Id.* at 12.

5       The court has considered Trustee's argument, but determines that the legal

6  analysis is not complete or persuasive.  First, Trustee's reliance on the Ninth Circuit's

7  unpublished disposition in *Trujillo* is inappropriate since that disposition is not properly

8  citable as judicial precedent applicable to pre-2007 Ninth Circuit dispositions pursuant to

9  Ninth Circuit Rule 36-3(c) (permitting citation for law of the case, or claim or issue

10  preclusion purposes, for factual purposes or for purchase of requesting publication of the

11  unpublished disposition, none of which apply here).  Second, *Trujillo* involved Nevada

12  law, which is not applicable here.

13       With respect to the state statute relied upon by Trustee, California Civil Code §

14  1213, the court notes that it states:

15

16       Every conveyance of real property or an estate for years therein
        acknowledged or proved and certified and recorded as prescribed by law
17       from the time it is filed with the recorder for record is constructive notice of
        the contents thereof to subsequent purchasers and mortgagees; and a
18       certified copy of such a recorded conveyance may be recorded in any
        other county and when so recorded the record thereof shall have the
19       same force and effect as though it was of the original conveyance and
        where the original conveyance has been recorded in any county wherein
20       the property therein mentioned is not situated a certified copy of the
        recorded conveyance may be recorded in the county where such property
21       is situated with the same force and effect as if the original conveyance had
        been recorded in that county.

22

23       This statute providing for constructive notice of a recorded deed or conveyance to

24  subsequent purchasers and mortgagees is not dispositive here.  Trustee's argument

25  solely based on this statute does not take into account another California statute,

26  California Evidence Code § 662, which actually addresses the effect of taking legal title

27  on beneficial title.

28
                                    5

1    California Evidence Code § 662 states: "The owner of the legal title to property is

2    presumed to be the owner of full beneficial title.  This presumption may be rebutted by

3    clear and convincing proof."  *See also, In re Marriage of Haines,* 33 Cal.App.4th 277, 294

4    (1995).  As noted in *Marriage of Haines,* the Comment of the Law Revision Commission

5    on California Evidence Code § 662 stated: "Section 662 codifies a common law

6    presumption recognized in the California cases.  The presumption may be overcome only

7    by clear and convincing proof."  33 Cal.App.4th at 294*, quoting,* 7 Cal.Law Revision

8    Com.Rep. at 111-112 (1965), *citing, Olson v. Olson,* 4 Cal.2d 434, 437 (1935) and *Rench*

9    *v. McMullen,* 82 Cal.App.2d 872 (1947).  As further noted in *Marriage of Haines,* "The

10   presumption is based on promoting the public 'policy . . . in favor of the stability of titles to

11   property.'"  33 Cal.App.4th at 294, *quoting,* California Evidence Code § 605.  Then, the

12   court in *Marriage of Haines* quoted the California Supreme Court which stated:

13   "Allegations . . . that legal title does not represent beneficial ownership have . . . been

14   historically disfavored because society and the courts have a reluctance to tamper with

15   duly executed instruments and documents of legal title."  *In re Marriage of Haines,* 33

16   Cal.App.4th at 294, *quoting, Weiner v. Fleischman,* 54 Cal.3d 476, 489 (1991).  Thus, as

17   further observed by the court in *Marriage of Haines,* "Section 662 is concerned primarily

18   with the stability of titles, which obviously is an important legal concept that protects

19   parties to a real property transaction, as well as creditors."  33 Cal.App.4th at 294.  As

20   stated by another court in *In re Marriage of Brooks & Robinson,* 169 Cal.App.4th 176

21   (2008), *abrogated on other grounds, In re Marriage of Valli,* 58 Cal.4th 1396 (2014),

22   "[t]hus, 'in the absence of any showing to the contrary, the status declared by the

23   instrument through which [the parties] acquired title is controlling.'"  *In re Marriage of*

24   *Brooks & Robinson,* 169 Cal.App.4th at 185, *citing inter alia and quoting, Knego v.*

25   *Grover,* 208 Cal.App.2d 134, 141 (1962).  "The presumption can be overcome only by

26   evidence of an agreement or understanding between the parties that the title reflected in

27   the deed is not what the parties intended."  *In re Marriage of Brooks & Robinson,* 169

28

6

1 | Cal.App.4th at 189-190, *citing, In re Marriage of Lucas,* 27 Cal.3d 808, 813 (1980) and *In*

2 | *re Marriage of Murguia,* 146 Cal.App.3d 853, 860 (1983).

3 | As the court stated in *Marriage of Brooks & Robinson,* "[t]o overcome the form of

4 | title presumption, the evidence of a contrary agreement or understanding must be 'clear

5 | and convincing.'"  169 Cal.App.4th at 190, *citing,* California Evidence Code § 662 and *In*

6 | *re Marriage of Weaver,* 224 Cal.App.3d 478, 486 (1990).  As further stated in *Marriage of*

7 | *Brooks & Robinson,* "[t]his standard requires evidence that is 'so clear as to leave no

8 | substantial doubt' [and] 'sufficiently strong to command the unhesitating assent of every

9 | reasonable mind.'"  169 Cal.App.4th at 190, *quoting, In re Marriage of Weaver,* 224

10 | Cal.App.3d at 487.

11 | In this case, when Martha transferred her one-half interest to Victor in the Property

12 | in 2010 by the Martha Quitclaim Deed, which was recorded with the Los Angeles County

13 | Recorder, Victor became the legal owner of a one-half interest in the Property.  Under

14 | California Evidence Code § 662, he is presumed to be the owner of full beneficial title of

15 | that one-half interest in the Property.  According to Trustee, Victor made a fraudulent

16 | transfer when he transferred his one-half interest in the Property to his brother, Lavell, in

17 | 2011 by the Victor Quitclaim Deed, based on the admitted facts stated in the Unilateral

18 | Pretrial Order that when the Subject Transfer was made, Debtors received less than

19 | reasonably equivalent value in exchange for the Subject Transfer, that Debtors were

20 | insolvent and that Debtors made the Subject Transfer with the actual intent to hinder,

21 | delay or defraud one or more of their creditors.  Complaint, ECF 1, at 3-4: Unilateral

22 | Pretrial Order, ECF 101, at 3-5.

23 | In opposition to Trustee's claims and arguments, Defendant argues that Victor

24 | never had an ownership interest [i.e., a beneficial interest] in the Property and thus, there

25 | was no fraudulent transfer in the Subject Transfer from Victor to him.  However, under

26 | California Evidence Code § 662, because Victor had legal title to a one-half interest in the

27 | Property when he made the transfer to Defendant, Victor is presumed to have been the

28 |

7

1  owner of the full beneficial title of that one-half interest, which presumption may be

2  rebutted by Defendant only by clear and convincing evidence.  If Defendant cannot rebut

3  the presumption of Victor having full beneficial title to the one-half interest based on his

4  legal title by clear and convincing evidence, the court must find that the Subject Transfer

5  from Victor to him was a fraudulent transfer based on the other admitted facts in the

6  Unilateral Pretrial Order that at the time of the Subject Transfer, Victor was insolvent,

7  received less than reasonably equivalent value for the transfer and had the intent to

8  defraud, delay or hinder one or more of his creditors.  *See, e.g.,* 11 U.S.C. § 548(a)(1)(A)

9  and (B); California Civil Code §§ 3439 *et seq.*

10        In support of his opposition to Trustee's claims and arguments, Defendant relies

11  upon his trial testimony and Victor's trial testimony.  Victor gave testimony at trial.

12  *Transcript of Trial Proceedings,* October 1, 2015 *("Trial Transcript"),* ECF 110 at 15-45.

13  At time of trial, Victor was age 61 and was not employed.  *Id.* at 15-16.  He was last

14  employed as a quality engineer at Northrup Grumman, having worked there for 34 years.

15  *Id.* at 16.  He retired in December 2010 due to medical disability and being laid off.  *Id.*

16        Victor's mother is Martha Boozer.  *Id.*  On March 20, 2010, Victor attended a family

17  meeting regarding his mother's health condition and care.  *Id.*  Attending the family

18  meeting with Victor were his brother Lavell, his sister Ruby, Christine Sanders, a friend of

19  his mother's, Dorothy Washington, another friend of his mother's who was a paralegal,

20  Jeff Miles, who came with Mrs. Washington, and his brother Alton, who called on the

21  phone from Georgia.  *Id.* at 16-18.  Martha Boozer was a minister at a church, and Mrs.

22  Washington was from his mother's church.  *Id.* at 20.  The general subject matter of the

23  family meeting was the need for some funds to help pay for his mother's in-home care.

24  *Id.* at 17.  Martha Boozer had congestive heart failure and dementia and was a fall risk.

25  *Id.*  His mother was living at her home in Inglewood, California, the Property, and his

26  brother Lavell was living with her.  *Id.*  No one else was living with her at the time.  *Id.* at

27

28                                                      8

17-18.  According to Victor, besides him and Lavell, there were four other siblings, all living.  *Id.* at 42.

Victor testified that at the family meeting, he and the others came up with a potential solution to help remedy the financial issues posed by the need for care for his mother.  *Id.* at 18, 40-41.  According to Victor, "[t]he plan was to – for me to – and my brother to obtain a loan to get financial support to be able to help her [his mother] with her medical needs and daily – for 24-hour care and anything else that was need for around the house at that time."  *Id.*  at 18, 40.  That is, according to Victor, "[w]e was going to try to get a home loan based on equity that – possibly that was in the home."  *Id.* at 18-19.  Asked why the decision was made for Victor to be the one to try to get the loan, he stated: "Me being the youngest [sibling] and the only one employed, and at that time, my brother, he couldn't get a loan, and my mom was too old, that they wouldn't go with that outside if it was a super high interest rate loan or something that they would try and – the – my mom's friend, Mrs. Washington, came up with the idea that that would be probably the best way for us to go."  *Id.* at 19.  In explaining this further, Victor stated:

> Because I was employed and the youngest child, that from her friend which told her that it would be a good thing for me to come on the house to try to obtain a loan to be able to get financial support for her care because she needed 24-hour care.

*Id.* at 18.  According to Victor, his mother,

> was in a convalescent home for one – two weeks that the hospital put her in.  She'd had bed sores.  So the family got together and pulled her back to her home where she wanted to be . . . She was eligible for Medicare, but Medicare wouldn't pay for 24-hour service.

*Id.* at 40-41.

At this time, Victor was employed, but out on disability, and Lavell was not employed.  *Id.* at 44.  According to Victor, he was the one going to pay the planned loan along with whatever Lavell was getting on his disability [i.e., pension].  *Id.* at 44-45, 48.

9

1    After the meeting to execute this plan, Mrs. Washington drew up documents,

2    including a medical power of attorney for Lavell to make medical decisions for their

3    mother, and a quitclaim deed putting her half of the Property into Victor's name, which

4    were notarized by a notary who was with Mrs. Washington.  *Id.* at 19.

5    Victor was never able to obtain the planned home equity loan for his mother

6    because about a week later, he had a massive rupture of his colon on April 19, 2010,

7    from which he almost died, and had to spend 10 days in the hospital.  *Id.* at 18-21.  Victor

8    was not able to get a loan because he was told that he needed to have been working and

9    present a current paycheck stub that he was not able to produce due to his medical

10    emergency.  *Id.* at 20.  About a month later, because Victor was not working, the loan

11    agent whom Lavell was working with decided to hold off on the loan application until

12    Victor was back at work and getting a paycheck.  *Id.*   Victor decided in about June or

13    July 2010 that he would not be able to obtain the loan, though at the time, he still planned

14    to return to work.  *Id.* at 21.  On November 28, 2010, Martha passed away.  *Id.* at 21-22.

15    In the 30 days after Martha passed away, Victor did not discuss transferring the

16    house back to Lavell because Victor was "basically grieving" and was having his own

17    "mental issues" and the subject never came up then.  *Id.* at 23.  Victor said that he "was

18    going through a whole lot with his ex-wife, not being able to go back to work when I'd

19    been able to work for years, and becoming disabled and having a body bag, a colostomy

20    bag hanging out."  *Id.*  At the time, Victor's relationship with his wife, Gail, was "on real

21    shaky grounds," and they had already separated.  *Id.*

22    Victor stated that the first time that he discussed with his brother Lavell about

23    transferring the Property back to Lavell was in April or May 2011 when Lavell came to

24    him and said he wanted it transferred back to him.  *Id.* at 23-25.   Victor transferred his

25    interest in the Property to Lavell on June 29, 2011.  *Id.* at 24-26; Exhibit 4.  According to

26    Victor, this had been discussed at the family meeting, and he had intended to transfer the

27    Property "back" to Lavell.  *Trial Transcript* at 24-25, 28.  Victor stated that he never had

28

10

the intent not to transfer the Property "back" to Lavell.  *Id.* at 25-26.  Victor also stated

that he never considered the Inglewood house that his mother and Lavell lived in to be

his.  *Id.* at 26.  Asked whose house it was, Victor stated: "It was always my mom's and

my dad's and Lavell's, and my dad passed away in 2000.  It became Lavell and my

mom's."  *Id.*  Asked why he transferred the Property "back" to Lavell, Victor stated, "From

the family agreement that we had back in March [2010], and it was always his property,

him and my mom's.  It wasn't mine.  So I gave it back to him as agreed."  *Id.* at 28.

Asked whether Victor intended to get the loan just before the transfer to Lavell, Victor

said no because the circumstances changed, that is, because "[m]y mom wasn't here.

She had passed away."  *Id.*  According to Victor, these were the circumstances why he

did not list the transfer of the Property to Lavell on his bankruptcy schedules, i.e.,

"[b]ecause the house didn't belong to me.  It always belonged to my mother and Lavell."

*Id.* at 32.

Victor was listed on title to the Property for approximately 16 months from March

2010 to June 2011.  *Id.* at 33, 38-39.  Victor did not pay anything for the initial transfer of

an interest in the Property to him in March 2010, and Lavell did not pay anything for the

transfer of that interest from Victor to Lavell.  *Id.* at 33, 39.  As of March 2010, the time of

the transfer of an interest in the Property to Victor, his mother and Lavell had title.  *Id.* at

40.  Asked why Victor thought the house was subsequently Lavell's, Victor stated: "He

[Lavell] was paying all the bills.  He took care of everything from womb to tomb when my

mom and dad was alive, and when my dad passed away, he really stepped up and being

financially supportive because he was living there [at the Property].  *Id.* at 33-34.  Right

after Victor's father died, his mother transferred a 50 percent interest in the Property to

Lavell, and according to Victor, his family did not ever have "any issue with the fact that it

was Lavell's house."  *Id.* at 34, 38, 40.  To Victor's knowledge, Lavell is still living there on

the Property.  *Id.* at 34.  According to Victor, he did not have "any issue with the fact that

Lavell was going to get the entire house," or did any of his brothers and sisters.  *Id.* at 43.

11

At the time of the transfer to Lavell on June 29, 2011, Victor described his general financial condition as follows: "I wasn't working.  I was out on disability.  I was trying to see what avenues – all the avenues I could take to try to get income coming in to help pay what bills I was able to pay.  So I wasn't really making the amount of money that I was making when I was able to work at that time, but I wasn't financially able to pay every bill at that time.  *Id.* at 28-29.  At the time, Victor was still planning to return to work and still had a top security clearance that he could use to get another job.  *Id.* at 29.  As of June 29, 2011, Victor had not considered filing for bankruptcy and did not talk to Lavell about filing for bankruptcy.  *Id.* at 29, 35.  Victor stated that admittedly, at the time, he was having problems paying his bills, was trying to work out a payment arrangement with Northrup Credit Union, one of his creditors, and had been served with papers from a collection lawsuit for debts his wife had incurred.  *Id.* at 30-31, 39-40.

Defendant (Lavell) also gave testimony at trial.  *Id.* at 48-62.  At time of trial, Lavell, Victor's older brother, was age 65, almost 66, and was not employed.  *Id.* at 48.  He retired from the United States Postal Service in October 2008 and was receiving no other benefits than retirement benefits.  *Id.* at 48-49.  Lavell was a sales representative for the Postal Service where he worked for 41 years.  *Id.* at 52.  Lavell attended the family meeting with Victor in March 2010 to discuss the need to obtain funds to pay for their mother's medical care.  *Id.* at 49.  Lavell's understanding of the purpose of the family meeting was: "Well, it was to – for the family to get together to see what kind of resources we can get to take care of my mother's needs because at the time she needed 24-hour in-home care, and that was the reason, how we were going to pay for it or how it was going to be done."  *Id.* at 49.  Asked what was the purpose of the transfer to Victor in March 2010, Lavell admitted that it was to obtain a loan, using Victor's credit because he was working and that Victor would help repay.  *Id.* at 60-61.  Asked who came up with the idea to transfer the Property to Victor, Lavell stated:  "Well, actually, it was – the idea from the – the church member [Mrs. Washington].  She's the one that really told us what

to do it, but I – we all got together and said that's about the only thing we can do." *Id.*

According to Lavell, none of the family members objected to the plan to transfer an

interest in the Property to Victor for this purpose. *Id.* at 49.

At the time of the transfer of an interest in the Property to Victor in March 2010,

Lavell was on title to the Property. *Id.* at 50-51. Lavell was first put on title to the

Property in 2000 "[b]ecause I was – you know, I was paying for everything, and since I

was paying for everything, we had it refinanced and put it in my name, me and mother's."

*Id.* Asked if he talked to his brothers and sisters about who the house [the Property]

actually belongs to, Lavell stated: "No. They knew all the time." *Id.* at 58-59. Asked why

"they knew all the time," Lavell stated: "I mean, it never came up. They knew I was taking

care of mom and dad. They knew it was my house. I did all the work and repairs. It was

just never – never discussed who it belonged to. They knew. Plus, they had their own

place anyway. . . They had their homes anyway. They never – it was never a

discussion." *Id.* at 59. According to Lavell, none of his brothers and sisters ever

expressed displeasure that he got the family house. *Id.*

After the transfer of an interest in the Property to Victor in March 2010, Lavell first

went to Victor to talk to him about transferring the interest "back" in March 2011 after their

mother passed away in November 2010 and Lavell had received the property tax bill with

Victor's name on it. *Id.* at 53-55. Getting the property tax bill in March 2011 got Lavell to

think "what would your [Victor's] name be on my property," saying "That's why I went to

him and said 'It's time to get your name off.'" *Id.* at 54. Asked why Lavell wanted Victor

to transfer the Property "back" to him, Lavell stated: "I was getting up in age, and I

wanted to do some things around the house, fix – fix up a few things, excuse me before I

got a little too old. . . I mean there was some repairs to be done around the house and

things that needed to be fixed up and stuff like that, and I just wanted to – you know, I

wanted to carry on with my life . . . I was going to attempt [to get a loan for the house] or

try to get a reverse mortgage, something that could help me out." *Id.* In March 2011,

13

1   when Lavell spoke to Victor "about giving [him his] property back," he stated that Victor

2   "was fine with it.  He told he was fine.  Hey, it was time anyway."  *Id.* at 55.  At the time,

3   Victor did not discuss his financial situation with Lavell.  Id.  Moreover, at that time, Victor

4   had not talked to Lavell about filing for bankruptcy, shielding the house from creditors or

5   incurring further debts.  *Id.* at 56.  The transfer by Victor to Lavell took place about four

6   months later on June 29, 2011, and according to Lavell, the delay was because Victor

7   had gotten ill.  *Id.*  When Victor transferred his interest to Lavell in June 2011, Lavell said

8   that he did not have discussions with Victor about Victor filing for bankruptcy, avoiding

9   debts or getting title out of his name to avoid claims.  *Id.* at 56-57.  Lavell stated that he

10  first found out about Victor's bankruptcy case when he received a letter from the

11  Bankruptcy Court [i.e., summons] that he "was being sued for 90-some thousand dollars."

12  *Id.* at 59.  Before hearing from the bankruptcy trustee, Lavell did not have any

13  conversations with Victor about his filing for bankruptcy, about avoiding creditors, about

14  keeping the house from creditors, or about Victor's financial situation.  *Id.* at 59-60.

15          Trustee does not dispute Victor's trial testimony that the purpose of the Martha

16  Transfer was to use Victor's credit in order to obtain a loan, which loan Victor admitted he

17  would repay, and rather, Trustee relies upon such testimony to argue that Victor had both

18  a legal and beneficial interest in the Property.  Trustee's First Supplemental Trial Brief,

19  ECF 111, at 2-3, *citing, Trial Transcript* at 40:22-25, 41:1-25 and 42:1.

20          In their trial testimony, Defendant and Debtor told a simple and powerful story,

21  which the court finds to be credible and true, that their mother was terminally ill without

22  the means to pay for the 24-hour medical care that she needed that Medicare would not

23  cover and that her family, including Defendant and Debtor, came up with a plan at an

24  emergency family meeting to put Debtor on title to help their mother get a secured loan

25  on her house to pay for 24-hour care that she desperately needed and that she did not

26  convey her interest to make a gift to him, but in order for her to get the loan she badly

27  needed to pay for her care and that at some point in the future, the property would be

28                                                        14

1 reconveyed to her as discussed and understood by those attending the family meeting.

2 Unfortunately, as often happens in life, things do not turn out as planned as the case

3 here.  The story is corroborated by the detailed and uncontroverted facts set forth in their

4 testimony.  Debtor and Defendant were a family of their mother, their father and six

5 siblings, including themselves.  Defendant was a longtime postal worker who recently

6 retired, but was living with Mom and Dad at the family home in Inglewood, the Subject

7 Property, and Defendant was supporting Mom and Dad financially and taking care of

8 them otherwise.  Debtor was still employed as an engineer for Northrup Grumman, the

9 defense contractor.  He and the other siblings had their families and had their own

10 homes.  When Dad died, Defendant was put on title to the house because he had taken

11 care of Mom and Dad and was still taking care of Mom, and there was no objection by

12 the other siblings, including Debtor.  Mom got seriously sick to the point that she needed

13 "round the clock" home care which Medicare did not cover, and she did not have the

14 means to pay for it.  Some of the siblings, including Debtor and Defendant, along with

15 some of her friends from her church, convened an emergency family meeting at the

16 house to talk about how to obtain the money to pay for Mom's care expenses not covered

17 by Medicare.  One of Mom's friends from church who was a paralegal suggested a plan

18 to have one of the siblings put on title and apply for a home equity loan on the house for

19 her.  The group meeting at the house thought Defendant who was taking care of Mom at

20 the house could not do it because having retired, he was not employed to qualify for a

21 loan.   The group thought another sibling, Debtor, should be the one to put on title to

22 apply for the loan for Mom because he was still employed and could qualify for the loan,

23 so he was put on title for this purpose.  None of the siblings objected to this plan which

24 meant that Debtor was put on title with Defendant.  However, the purpose of putting

25 Debtor on title to the Property to obtain the secured loan on it for Mom's 24-hour care

26 was frustrated because Mom never got the loan through Debtor.  Debtor had his own

27 health problems because his colon ruptured, which nearly cost him his life, and he and

28

15

his wife were going through a divorce, and Mom then died from her illness.  After Mom

died, Debtor delayed several months in transferring the Property to Defendant because

he was grieving over the loss of Mom and he was having his own problems with his

ruptured colon, having to learn how to live with a colostomy bag, and with his former wife

in their divorce.  Defendant expected to get the house because he was the one sibling

who took care of Mom and Dad financially and otherwise, and apparently, no other

sibling, including Debtor, objected to that because he was the only one doing that.  After

being reminded of Debtor being on title for the purpose of a loan that was never obtained

by looking at the property tax bill for the house, Defendant, not knowing of Debtor's

financial problems, asked Debtor to transfer the house back to him since there was no

loan and it was understood that Defendant was to get the house.  Debtor who never gave

anything for the transfer of an interest in the house to begin with transferred it back for

nothing.

        The court finds that the trial testimony of Defendant and Debtor that their mother

did not transfer a beneficial interest in her one-half interest in the Property to Debtor to be

credible and establishes by clear and convincing evidence as required under California

Evidence Code § 662 that Debtor's legal title to a one-half interest in the Property was

not full beneficial title of that one-half interest, which remained in the mother.  In all due

respect to Trustee, who is simply doing his job to investigate the financial affairs of

Debtor and take appropriate action to recover, collect and distribute assets of the estate

on behalf of Debtor's creditors, 11 U.S.C. § 704, his efforts here to set aside the transfers

as "fraudulent" would unduly take advantage of a family's desperate attempt to use the

Property, the asset of a third-party nondebtor, Debtor's mother, who was terminally ill, to

help her apply for and obtain a loan by using the device of putting legal title in the name

of her employed son, Debtor, to draw upon her equity in her house to pay for her non-

Medicare covered expenses of her 24-hour home care urgent and necessary for her to

live out the last days of her life, and this would exalt the form over the substance of the

16

1  transfers where the uncontroverted evidence was that the mother's transfer to Debtor

2  was not a gift, but an artifice deemed necessary at the time for her to obtain funds

3  through a loan to pay for her 24-hour home care, using her home equity as this was to be

4  a secured loan (as opposed to being solely based on Debtor's personal credit as Trustee

5  seems to overlook in his argument).  The undisputed fact that the loan was never

6  obtained, despite the purpose of her transfer to Debtor, indicates a frustration of her

7  purpose, and it would be the supreme irony (and in this court's view, the ultimate

8  "gotcha") that the transfers here would be set aside as "fraudulent" to liquidate the

9  Property in order to pay Debtor's creditors since no one disputes the true purpose of the

10  transfers to obtain a loan to pay for the mother's care, which transfers were not intended

11  in this court's determination to transfer the mother's beneficial title to Debtor by gift.

12         Because the court determines that Defendant has shown by clear and convincing

13  evidence that his mother, Martha Boozer, transferred her one-half interest in the Property

14  to his brother, Debtor or Victor, as a matter of convenience to help him obtain a loan on

15  the Property owned by Defendant or Lavell and their mother, Martha, to help pay for her

16  medical care in the last days of her life, and although Victor was on legal title on the

17  Property, Victor did not have a beneficial interest in the Property.  Before the transfer to

18  Victor, the title to the Property was held in joint tenancy, one-half interest in Lavell, and

19  one-half interest in Martha.  As a result of the transfer by Martha to Victor, Lavell had a

20  one-half interest in the Property in his name, and although Victor had legal title to a one-

21  half interest in the Property, the beneficial title to his one-half interest was still Martha's.

22  If this is correct, then the issue is what was the effect of Victor's prepetition transfer of

23  legal title to Lavell after Martha's death, who was the true beneficial owner of the one-half

24  interest in Victor's name.  The answer is not clear as probably the court and the parties

25  have not had an opportunity to consider or brief this issue.  If Martha was the beneficial

26  owner of the one-half interest in the Property in Victor's name, it would seem that her

27  one-half beneficial interest would go to her heir(s) by testate disposition or intestate

28

17

1 succession under state law, which may have been Lavell only or may have included

2 Victor and the other siblings.  Thus, probably after Martha's death, her one-half beneficial

3 interest should have been transferred to her heir(s) and not transferred by Victor to Lavell

4 unless Lavell was the only beneficiary of a will, which we do not know based on this

5 record.  But what is clear to the court is that the transfer by Victor to Lavell after Martha's

6 death was not a fraudulent transfer of Victor's beneficial interest in the Property because

7 he had none, contrary to Trustee's claims in this case, and that the owner of the one-half

8 beneficial interest belongs to the heir(s) of Martha Boozer.  Because the court finds that

9 Victor did not have a beneficial interest in the Property, the court need not address the

10 merits of Trustee's claims in the complaint that the transfer of his interest in the Property

11 was a fraudulent transfer under federal or state law.

12         As another issue, although Trustee's papers did not argue such, the court

13 observes that there are two California Court of Appeal decisions and one Ninth Circuit

14 Bankruptcy Appellate Panel decision which make statements that evidence that title was

15 taken to obtain a loan cannot per se rebut California Evidence Code § 662, California's

16 general presumption of record title.  Nonetheless, based on the court's review of the

17 jurisprudence of California Evidence Code § 662, these statements are inconsistent with

18 the decision of the California Supreme Court in *Olson v. Olson, supra,* which has not held

19 that the fact that title was taken to obtain a loan itself cannot rebut the California

20 Evidence Code § 662 presumption.  As explained below, the court should follow the

21 holding of the California Supreme Court, the state's highest court, in *Olson,* in holding

22 that there is no such per se rule and in not following the pronouncements of these two

23 California Court of Appeal decisions and one Ninth Circuit Bankruptcy Appellate Panel

24 decision which are inconsistent with the holding in *Olson*.  *See, In re Obedian,* ___ B.R.

25 ___, 2016 WL 806138, at *8 (Bankr. C.D. Cal. 2016) (this court stating "in interpreting

26 state law, the Ninth Circuit must following the decisions of the state's highest court"),

27 *citing,* 2 Goelz, Watts and Batalen, *Rutter Group Practice Guide: Federal Ninth Circuit*

28

1   *Civil Appellate Practice,* ¶ 8:204 at 8-41 (2015), *citing inter alia, Johnson v. Frankell,* 520

2   U.S. 911, 916, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997) ("Neither this Court nor any other

3   federal tribunal has any authority to place a construction on a state statute different from

4   the one rendered by the highest court of the State.") and *Muniz v. United Parcel Service,*

5   *Inc.,* 738 F.3d 214, 219 (9th Cir. 2013) (stating "[d]ecisions of the California Supreme

6   Court, including reasoned dicta, are binding on us as to California law.").

7       In *Marriage of Brooks & Robinson, supra,* the California Court of Appeal stated

8   that California's general presumption of record title "cannot be rebutted by evidence that

9   title was taken in a particular manner merely to obtain a loan."  169 Cal.App.4th at 190.

10  In support of this statement, the court cited *In re Marriage of Kahan*, 174 Cal.App.3d 63,

11  69 (1985), but the reference to *Kahan* is mistaken because what *Kahan* actually said was

12  something different than what *Brooks & Robinson* cited it for.  The *Kahan* court merely

13  stated that the form of the title created a presumption and then cited two California Court

14  of Appeal cases, *In re Marriage of Anderson*, 154 Cal.App.3d 572, 578 (1984) *and In re*

15  *Marriage of Neal*, 153, Cal.App.3d 117, 124 (1984), as examples where two California

16  Courts of Appeal have applied California Civil Code § 4800.1—a now repealed statute

17  which presumed that property acquired during marriage in joint tenancy is community

18  property—where one spouse transfers separate property to joint tenancy in order to

19  secure a loan.  *In re Marriage of* Kahan, 174 Cal.App.3d at 69.  The *Kahan* court did not

20  discuss the holdings of those cases, nor did the *Kahan* court state that the presumption

21  cannot be rebutted by clear and convincing evidence that the parties intended the form of

22  title only to facilitate a loan and not to convey a beneficial interest in the property.  *Id.* at

23  63-73.

24      The only other published cases that cited the above-mentioned statement from

25  *Marriage of Brooks & Robinson* merely quote that statement and its citation to *Kahan*

26  verbatim with no analysis of the actual language in *Kahan,  In re Marriage of Fossum*,

27  192 Cal.App.4th 336, 344 (2011) and *In re Fadel*, 492 B.R. 1, 14 (BAP 9th Cir. 2013).

28

1    As previously discussed, California Evidence Code § 662 provides: "The owner of the

2    legal title to property is presumed to be the owner of the full beneficial title.  This

3    presumption may be rebutted only by clear and convincing proof."  The Comment of the

4    Law Revision Commission states in full: "Section 662 codifies a common law

5    presumption recognized in the California cases.  The presumption may be overcome only

6    by clear and convincing proof.  7 Cal.Law Rev. Com.Rep. (1965)  pp. 111-112, *citing*,

7    *Olson v. Olson*, 4 Cal.2d at 437 and *Rench v. McMullen, supra*.  Because the plain

8    meaning of the statute, California Evidence Code § 662, does not state or in any way

9    suggest that the general presumption of record title cannot be rebutted by evidence that

10   title was taken to obtain a loan, and because the statute is based on common law

11   principles in *Olson* and *Rench*, the court examines those cases in order to ascertain the

12   meaning and purpose of the statute.

13       *Olson* involves a peculiar set of facts that are illuminating to the matter before this

14   court.  In *Olson*, Werner and Milda, during marriage, acquired certain real property in

15   1924 and took title as joint tenants.  4 Cal.2d at 435.  In 1929, Milda, who had made a

16   deposit with a steamship to travel to Sweden, had difficulty obtaining a passport because

17   Werner was not a naturalized U.S. citizen.  *Id.* at 436. Upon the advice of counsel, Milda

18   annulled her marriage with Werner, which allowed her to obtain her passport, traveled to

19   Sweden, and planned to remarry Werner upon her return.  *Id.*  While in Sweden, Milda

20   received a letter from Werner stating that they needed to raise money to refinance their

21   real property in order to renew the encumbrances on the real property.  *Id.*  Accordingly,

22   Werner requested that Milda gift him her joint tenancy share so that he could refinance

23   the real property.  *Id.*  The letter also stated that once the real property had been

24   refinanced Werner would return the title to its former joint tenancy status between him

25   and Milda.  *Id.*

26       Milda complied and gifted her interest to Werner.  *Id.*  Nonetheless, upon Milda's

27   return from Sweden in October of 1929, they were not remarried, and in May of 1930,

28                                                    20

1  Werner suddenly died of pneumonia, leaving no will, with the real property title in his

2  name alone. *Id.* Thereafter, Werner's mother was appointed administratix of Werner's

3  estate and Bank of America filed a $2,150 claim against the estate based upon its first

4  deed of trust. *Id.* at 437.

5      At trial, Milda was unable to produce Werner's letter promising that Werner would

6  restore her joint tenancy interest, and therefore, the question of whether such promise

7  was in fact made depended solely upon Milda's uncorroborated testimony. *Id.* The

8  California Supreme Court stated that the case "resolves itself into one involving a conflict

9  in evidence", determined that there was sufficient support for the trial court's judgment,

10  and thus affirmed the trial court's judgment as to the real property. *Id.* at 437-439.

11  Accordingly, the trial court found against Milda and in favor of Johanna, Werner's mother.

12  *Id.* at 439.

13      *Olson*, which is codified by California Evidence Code § 662, does not express a

14  per se rule that the form of title cannot be rebutted by evidence that title was taken in a

15  particular manner merely to obtain a loan.  First, a plain reading of the statute, California

16  Evidence Code § 662, indicates that the court should not read into the plain language of

17  the statute such a limiting per se rule which is not so expressed.  *See, e.g., United States*

18  *v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989)("The task of resolving the dispute

19  over the meaning of [a statute] begins where all such inquiries must begin: with the

20  language of the statute itself.  In this case it is also where the inquiry should end, for

21  where, as here, the statute's language is plain, 'the sole function of the courts is to

22  enforce it according to its terms.'")(citations omitted).  Second, contrary to the lower tier

23  appellate court's statement in *Marriage of Brooks & Robinson*, the California Supreme

24  Court in *Olson*, by evaluating the evidence of whether there was an agreement to return

25  title to Milda, and determining that such evidence, based solely on Milda's

26  uncorroborated testimony, was insufficient, necessarily implied that the form of title can

27  be rebutted by evidence that title was taken in a particular manner merely to obtain a

28

21

loan.  *See Id.* at 437-438.  That is, had the California Supreme Court in *Olson* determined that there was a per se rule that form of title cannot be rebutted by evidence that title was taken merely to obtain a loan, as expressed in *Marriage of Brooks & Robinson*, the California Supreme Court would not have needed to consider weighing the evidence of whether there was an agreement.

In *Rench*, Rench brought an action to enforce an alleged resulting trust against McMullen.  82 Cal.App.2d at 873.  McMullen had purchased certain real property under an arrangement worked out by Rench with a vendor.  *Id.*  McMullen was the signatory to the original purchase option, made the down payment on the real property, and paid the balance of the purchase price.  *Id.*  Rench testified that after he was unable to raise enough funds to purchase the real property, he informed McMullen of the opportunity, and the two of them orally agreed that McMullen would advance $15,000 as a loan to Rench, take title in McMullen's name as security, and transfer the real property to Rench once Rench repaid McMullen's advances with six percent interest.  *Id.* at 874.  Later, Rench commenced the action to enforce a resulting trust against McMullen.  *Id.* McMullen died while the action was pending and the executor and executrix of his will were substituted in as defendants.  *Id.* at 873.  On appeal, the California Court of Appeal, in ruling for McMullen and upholding the trial court's ruling, stated, "where as here the only direct evidence of a resulting trust comes from the lips of one whom the court may decide is discredited it certainly cannot be said on appeal that the court was bound to believe him."  *Id.* at 875.  As in *Olson*, *Rench* also necessarily implies that the general presumption of record title can be rebutted by evidence that title was taken in a particular manner merely to obtain a loan.  Moreover, as in *Olson*, the California Court of Appeal in *Rench* would not have considered weighing the evidence of the existence of an underlying agreement had there been a per se rule against rebutting general presumption of record title with evidence that title was taken merely to obtain a loan.

22

1     Accordingly, based upon a review of California Evidence Code 662's plain

2   language, the comments of the California Law Review Commission reflecting the

3   legislative intent behind the statute, the implicit holding of the California Supreme Court in

4   *Olson* inconsistent with the statement of the per se rule against loans in *Brooks &*

5   *Robinson*, and the *Olson* and *Rench* cases upon which the statute is based, the court

6   declines to follow the per se rule stated in *Marriage of Brooks & Robinson*.  There is no

7   legitimacy to the statement of *Marriage of Brooks & Robinson* interpreting California

8   Evidence Code § 662, which does not come from the statute, or from the case law of the

9   state's highest court, the California Supreme Court.  For the same reasons, the court

10  finds unpersuasive, and declines to follow, the statement made by the Bankruptcy

11  Appellate Panel in *In re Fadel*, citing *Marriage of Brooks & Robinson* and adopting the

12  per se rule from that case.  *In re Fadel,* 492 B.R. at 14, *citing and quoting, In re Marriage*

13  *of Brooks & Robinson,* 169 Cal.App.4th at 190; *see also, In re Arnold,* 471 B.R. 578, 588-

14  590 (Bankr. C.D. Cal. 2012) (stating this court's view and analysis why BAP decisions are

15  not binding in general on the bankruptcy courts of the circuit, though its decisions will be

16  considered for their persuasive value), *citing inter alia, Bank of Maui v. Estate Analysis,*

17  *Inc.,* 904 F.2d 470, 471-472 (9th Cir. 1990); *Zachary v. California Bank & Trust,* 811 F.3d

18  1191, 1193 n. 1 (9th Cir. 2016) (pretermitting consideration of the issue of whether BAP

19  decisions are binding on all bankruptcy courts in this circuit).

20     Instead, the court follows the California Supreme Court's decision in *Olson*, as well

21  as the California Court of Appeal's decision in *Rench*, both of which necessarily imply

22  that the form of title can be rebutted by evidence that title was taken in a particular

23  manner merely to obtain a loan, as well as the plain language of California Evidence

24  Code § 662.  As in *Olson* and *Rench*, the court undertakes an evidentiary analysis of

25  whether there was proof of an agreement that legal title only, and not beneficial title, was

26  transferred merely to obtain a loan, but unlike in *Olson* and *Rench*, as previously stated,

27  the court determines on the facts in this case that Defendant has shown by clear and

28

23

1  convincing evidence that the transfer from Martha to Victor was merely to put Victor on

2  legal title, and that Martha still held the beneficial interest in the Property.

3         As a separate issue, Trustee has objected to the presentation of evidence by

4  Defendant, and consideration by the court of such evidence, on issues and defenses not

5  set forth in the Unilateral Pretrial Order, filed and entered on July 24, 2015, which

6  provides in part that: "THIS ORDER SHALL SUPERSEDE THE PLEADINGS AND

7  GOVERN THE COURSE OF THE TRIAL OF THIS CAUSE, UNLESS MODIFIED TO

8  PREVENT MANIFEST INJUSTICE."  *See also,* Fed. R. Bankr. P. 7016; Fed. R. Civ. P.

9  16(d) ("After any conference under this rule, the court should issue an order reciting the

10  action taken.  This order controls the course of the action unless the court modifies it.").

11  Trustee argues that Defendant has not met the applicable standard for amending the

12  pretrial order to prevent "manifest injustice" in *Byrd v. Guess,* 137 F.3d 1126, 1132 (9th

13  Cir. 1998) that the trial court should consider four factors: (1) the degree of prejudice or

14  surprise to the defendants if the order is modified; (2) the ability of defendants to cure the

15  prejudice; (3) any impact on the orderly and efficient conduct of the trial; and (4) any

16  willfulness or bad faith by the party seeking the modification.  *See also, Galdamez v.*

17  *Potter,* 415 F.3d 1015, 1020 (9th Cir. 2005) (citing and following *Byrd v. Guess).*   The

18  court overrules Trustee's objection in that although the Unilateral Pretrial Order provided

19  that it "shall supersede the pleadings and govern the course of the trial of this cause,

20  unless modified to prevent manifest injustice," the court determines that it was necessary

21  to allow the presentation of evidence by Defendant and for the court to consider it to

22  prevent manifest injustice.  Based on the evidence presented by Defendant on the issues

23  and defenses raised at trial, which were not specified in the Unilateral Pretrial Order, the

24  court determines that Defendant had viable defenses to the complaint, which were not

25  fully and fairly presented earlier in the pretrial conference proceedings based on

26  dereliction of duty of counsel for Defendant in failing to participate in the preparation and

27  filing of a joint pretrial stipulation and to appear at the continued pretrial conference on

28

June 30, 2016 without excuse as required by Local Bankruptcy Rule 7016-1.  The court

had previously indicated to counsel for the parties that it would consider the defenses

raised by Defendant, which were identified in prior proceedings in this case, though not

formally raised in Unilateral Pretrial Order submitted by Trustee's counsel without the

participation of Defendant's counsel, and which the court discussed at prior hearings

reserving ruling on Trustee's summary judgment motion.  *See, e.g.,* Defendant's

Opposition to Plaintiff's Motion for Summary Judgment, Debtor/Defendant's Response to

Plaitiff's [sic] Statement of Uncontroverted Facts, in Opposition to Plaintiff's Motion for

Summary Judgment and Declaration of Victor Sloan, filed on January 15, 2015, ECF 80

at 5, 6, 8, 9 and 10 (asserting that title to the Property was put in Debtor's name "for

purposes of attempting to secure a loan against the property to pay for their dying

mother's care" and "[a]fter they were unable to pay for the care, the property was

transferred back to Lavell [Defendant]").  Inexplicably, in spite of Defendant's viable

defenses, his counsel failed to participate in the preparation and filing of a joint pretrial

stipulation and failed to appear at the continued pretrial conference on June 30, 2016

without excuse in violation of Local Bankruptcy Rule 7016-1.  *See,* ECF 89 and 101.  In

applying the four *Byrd v. Guess* factors here, the court determines that the prejudice or

surprise to Trustee as the nonmodifying party in modifying the Unilateral Pretrial Order is

minimal or non-existing since Defendant's pleadings put Trustee on notice of the issues

and evidence raised by Defendant's defenses, Trustee had full ability to cure the

prejudice since he had a full and fair liability to discover Defendant's defenses through

discovery, such as taking the depositions of Defendant and Debtor where they answered

Trustee's questions about these defenses, and to cross-examine them at trial, the

modification had no impact on the orderly and efficient conduct of the trial as the court

indicated that it would allow the witnesses to testify and be cross-examined and the

parties had a full and fair opportunity to address the testimony on Defendant's defenses

through post-trial briefing, and the court cannot say that Defendant acted willfully or in

1   bad faith because as indicated by his attendance in court at various hearings in this case,

2   Defendant intended to defend in this case based on the defenses that he has steadfastly

3   asserted in this case, despite the lackadaisical representation by his counsel as

4   previously noted.  Based on these circumstances, it would be manifestly unjust for the

5   court to impute counsel's dereliction to Defendant.

6       For the foregoing reasons, the court determines that judgment should be entered

7   in favor of Defendant and against Plaintiff on the claims for fraudulent transfer in the

8   adversary complaint and that Plaintiff's motions for summary judgment and for judgment

9   on the pleadings, which the court had reserved ruling on, should be denied.  Whether the

10  bankruptcy estate through Victor has an interest in the Property through testate

11  disposition or intestate succession from Martha will have to be determined in a separate

12  proceeding.

13      This memorandum decision constitutes the court's findings of fact and conclusions

14  of law pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil

15  Procedure 52.  A separate judgment is being entered concurrently.

16      IT IS SO ORDERED.

17                                            ###

18

19

20

21

22

23  Date: March 30, 2016

24                          _____

25                          Robert Kwan
                            United States Bankruptcy Judge

26

27

28
                                            26